**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Jamie Martens,<br><br>Plaintiffs,<br>v.<br><br>United States of America,<br><br>Defendant. | Case No. ______________________<br><br><br>**COMPLAINT** |

Plaintiff Jamie Martens, by her attorney, bring this complaint against the United States of America pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §1346(b) and 28 U.S.C. Chapter 171.

**INTRODUCTION**

1. Operation Metro Surge was not limited to the Twin Cities. Federal immigration agents terrorized immigrant communities across the state, including in St. Peter, MN.

2. Jamie Martens, a registered nurse, who has dedicated her life to helping people, could not stand by and watch her community be terrorized by these agents. She took to observing and recording the action of ICE in St. Peter, MN.

3. On January 29, 2026, immigration agents attacked her while she was recording them. They forcefully tore her out of her car and sat on her back. The agents significantly agitated her back injuries and created a posterior annular tear at L4 in her vertebrae, contributing to her chronic lower back pain.

4. Agents then arrested Ms. Martens and began to drive her toward the Whipple Building in St. Paul. However, they got a call from someone and, before getting to the Twin Cities, turned around and returned Ms. Martens to St. Peter. They never charged her with any crime.

5. The federal agents had no legal authority to treat Ms. Martens as they did. The federal agents disregarded the United States' own policies regarding use of force, their arrest power, and the treatment of observers, among others.

## PARTIES

6. Jamie Martens is 47-year-old resident of St. Peter, MN.

7. The United States of America is the proper defendant to answer for the acts of "federal agencies" and their employees, officers, and agents. Such agencies include, without limitation, the U.S. Department of Homeland Security, its component agencies, such as the U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").

8. At all relevant times, upon information and belief, the agents were deployed for Operation Metro Surge, were using federal vehicles and equipment, were wearing federally supplied tactical gear, and used federal facilities.

9. At all relevant times, federal officers referenced in this Complaint were employees of the United States, working within the scope and course of their employment in these federal agencies.

10. At all relevant times, the federal officers referenced in this complaint were "investigative or law enforcement officers" within the definition of 28 U.S.C. § 2680(h).

## JURISDICTION AND VENUE

11. This Court has jurisdiction over Ms. Martens' claims under the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

12. Ms. Martens' has exhausted all available administrative remedies pursuant to 28 U.S.C. § 2675.

13. Ms. Martens' filed an administrative complaint with the United States Department of Homeland Security, US Customs and Border Protection, and US Immigration and Customs Enforcement on or about April 22, 2026, under the Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq., seeking redress for the tortious conduct of the officers and the damages he received.

14. The administrative complaints were both sent by electronic mail as well as US Postal Service certified mail.

a. CBP acknowledged receipt of the administrative claim on April 24, 2026.

b. DHS did not acknowledge receipt of the administrative claim but USPS tracking shows that they received the complaint on May 4, 2026.

c. ICE did not acknowledge receipt of the administrative claim but USPS tracking shows that they received the complaint on May 4, 2026.

- On June 30, 2026, ICE counsel Nicorie Clarke sent Ms. Martens' attorney a letter requesting more information regarding Ms. Martens' claim. However, on July 2, 2026, Ms. Clarke emailed Ms. Martens attorney and rescinded the request, stating that "I was informed that CBP has taken lead on this claim."

15. Six months have now elapsed since Ms. Martens' claims were received with no decision from CBP or any other agency. The claims are therefore deemed finally denied. 28

U.S.C. § 2675(a). Plaintiff has exhausted her administrative remedies, and this action is timely under 28 U.S.C. § 2401(b).

## FACTS

16. Jamie Martens is a Registered Nurse Administrative Supervisor at St. Peter State Hospital and lives in St. Peter, Minnesota. She has a Bachelor of Science in nursing from The College of St. Scholastica in Duluth, MN.

17. Ms. Martens has been a prominent observer in St. Peter, trying to alert people about ICE activities since the build-up began.

18. On January 29, 2026, Jamie was assisting in observing immigration activities in St. Peter, MN.

19. She drove to the north side of St. Peter to help other observers who felt they were in danger from ICE.

20. When Ms. Martens arrived at the location where ICE was at, she saw the other observer and parked behind them.

21. Both Ms. Martens and the other observer remained in their cars and were legally observing a red Mazda vehicle. They were parked roughly two blocks away from the red Mazda.

22. The red Mazda began to leave the area and the other observer began to follow the red Mazda.

23. Ms. Martens followed behind the other observer.

24. Within a few blocks, the red Mazda entered a roundabout but refused to leave the roundabout, instead circling behind the other observer.

25. The observer left the roundabout and was followed by the red Mazda. Ms. Martens followed the observer and the red Mazda.

26. The other observer decided to drive to the police station because ICE was following them.

27. Ms. Martens continued to drive south down Highway 169 with the intention of going to the Marway Mobile Home Park.

28. She was concerned because ICE vehicles were following the school buses home. Ms. Martens was worried about what might happen to children if ICE were to catch them without observers present, perhaps using children and hostages to force parents to come out of their homes.[1]

29. She also knew that the red Mazda was going in the general direction of Marway.

30. Ms. Martens was behind the red Mazda on Highway 169 but stopped at a red light. When she began driving south down Highway 169 again, she found that the red Mazda was waiting for her. The driver had pulled over to the shoulder of the road until she passed it. Video from Ms. Martens' dash cam caught the vehicle parked on the shoulder of the road.



[1] Such actions happened as part of Operation Metro Surge, most famously when immigration agents used Liam Conejo Ramos as bait to lure his father out of their home only a week earlier. Images of the crying 5-year-old Liam, wearing a bunny hat, antagonized the nation.

31. As she passed the car, she saw that the agents in the car were using phones to take pictures of her while she passed them.

32. Ms. Martens took the next exit off of 169, toward Marway. However, in front of her was another SUV with Georgia license plates. ICE agents were in this car as well.

33. The Georgia car was driving recklessly and slowed down to under 20 mph.



34. Ms. Martens calmly passed that vehicle and decided to leave the area. The immigration officers followed her.

35. The red Mazda took the lead in following Ms. Martens.

36. She realized that instead of going to Marway, three ICE vehicles were now following her instead.

37. Defendant would later claim that the agents following Ms. Martens did so to give her a "warning." Defendant also claimed that its officers were working on a targeted enforcement to arrest a serial criminal alien.[2] Those agents would be part of a Fugitive Operations Team.

38. Knowing she was being followed by ICE vehicles, Ms. Martens decided to drive to the St. Peter police station.

39. At no point did the vehicles use sirens, flashing lights, or provide other indications that they were law enforcement.

40. Upon information and belief, the federal agents were in violation of federal policies and regulations regarding vehicle pursuits by using vehicles without lights and sirens.[3]

41. Further, upon information and belief, federal agents were in violation of federal policies and regulations regarding vehicle pursuits. They knew that Ms. Martens was a USC who had not committed any criminal acts, let alone a serious violent crime, as required by regulation and policy.[4]

42. Further, upon information and belief, the ICE agents pursuing her were in violation of policy as policy specifically prohibits ICE agents from vehicle pursuits.[5]

---

[2] Homeland Security (@DHSgov), X, (Jan 31, 2026, at 6:04 PM) https://x.com/DHSgov/status/2017750905290911774.

[3] See generally 8 CFR 287.8(e); see also HSI Emergency Driving Handbook, May 10, 2012, Sec. 5.4, prohibited practices.

[4] See generally 8 CFR 287.8(e); See also USICE Fourth Amendment Refresher Training, Office of the Principal Legal Advisor, Revised July 2025.

[5] DHS, ERO Fugitive Operations Handbook, Oct. 30, 2018, Part 3:H Vehicle Pursuits ("FOT officers are not authorized to conduct vehicle pursuits under any circumstances."); Part 3:I Vehicle Stops ("Officers should not pursue a target who fails to pull over, as ERO law enforcement officers are not authorized to engage in vehicular pursuits. If the suspect vehicle fails to pull over (flees in the vehicle), do not pursue. Instead, officers should obtain accurate vehicle and occupant information and direction of travel.").

43. As Ms. Martens was driving, the red Mazda drove recklessly on the road, often in the opposite lane, potentially causing accidents for other drivers. Ms. Martens was worried that the car would ram her or knock her off the road.

44. Within a few moments, the red Mazda veered in front of her, blocking the road, in violation of ICE policies.[6]



45. The two other unmarked vehicles successfully blocked Ms. Martens' car in by parking next to her and behind her, making it impossible for her to leave.

46. Three federal agents got out of the red Mazda and pointed guns at her, in violation of DHS policy.[7]




[6] HSI Emergency Driving Handbook, May 10, 2012, Sec. 5.4, prohibited practices.
[7] Alejandro N. Mayorkas, Department of Homeland Security, *Memo: Update to the Department Policy of the Use of Force* (February 6, 2023). https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf.

47. They did not identify themselves as law enforcement.

48. John Doe #1 was driving the car and appears in the image below:



49. John Doe #2 was sitting in the back seat and appears in the image below:



50. John Doe #3 was in the front passenger seat and appears in the image below:



51. Another agent, John Doe #4, who was in a car that boxed her in by parking at the side of her car, also got out of his car and approached her while pointing a gun at her.

52. Ms. Martens was terrified that the agents were going to murder her.

53. The agents demanded that Ms. Martens get out of the car and called her a "bitch."

54. She lawfully refused.

55. John Doe #1 and #4 were the ones doing most of the talking to her.

56. One of the agents opened the door and forcefully attacked her, telling her to "get out of the fucking car." They unbuckled her seat and began pulling on her arms and tugging on her.

57. Ms. Martens again told the agents that she would not get out of the car. She also told them not to touch her.

58. The agents again physically grabbed Ms. Martens.

59. By this time a crowd of observers had arrived, including Ms. Martens husband, who is also a supervisor at the St. Peter hospital.

60. Agents falsely accused her of "impeding" a federal investigation.

61. The observers called 911.

62. The agents physically pulled Ms. Martens from the car, dragged her a few feet across the pavement, and then an officer knelt on her lower back.

63. She was thrown to the ground with significant force, cutting her hand.



64. The agents kneeled on her hips only a few months after Ms. Martens had had hip surgery.



65. She had been in physical therapy at the time. She had degenerative joint disease of both hips and required surgery on the left hip for a femoroacetabular impingement and on the right hip of a labral tear.

66. The agents aggravated this injury and significantly injured her back as well. The agents caused a posterior annular tear at her L4 disc, which caused and continues to cause significant on-going pain in her lower back.

67. Ms. Martens now needs to get radio frequency ablation about four times a year to cauterize the nerve pain in her lower back. Eventually, she will require surgery when the ablations are no longer effective.

68. Ms. Martens' husband recorded his wife's arrest. Agents attempted to stop him.

69. An agent, John Doe #5, wearing an HSI coat, told him that Ms. Martens was obstructing them because she had been following them. John Doe #5 appears in the image below:



70. Following and observing immigration agents is legal and no basis to arrest Ms. Martens. As stated above, Defendant also claimed that they were pursuing her not to arrest her but to give her a warning.

71. While being arrested and placed in an ICE vehicle, a male agent improperly patted Ms. Martens' breasts after she was handcuffed.

72. Masked agents placed Ms. Martens in an SUV and started driving north, presumably toward the Whipple building in St. Paul where many citizens and immigrants had been forced to go to when the federal government violated hundreds of people's rights in Minnesota.

73. Ms. Martens husband soon afterwards got a call from St Peter Police Chief Matt Grochow.

74. Upon information and belief, Chief Grochow contacted ICE and had them bring Ms. Martens back to St. Peter.

75. Before the ICE vehicle got to the Whipple building, it turned around and brought Ms. Martens to the St. Peter police station.

76. The immigration agents left Ms. Martens with Chief Grochow. They did not inform her on why they brought her back to St. Peter.

77. Chief Grochow apologized to Ms. Martens and said he couldn't believe it had happened. He drove her home. No charges were filed against her.

78. The incident received significant coverage and video of the agents' pointing guns at her went viral.[8]

---

[8] Hannah Yang, Matt Sepic and David Schaper, "St. Peter police chief intervened and got federal agents to release resident, sources say" MPRNews (January 31, 2026),

79. After the incident received significant media coverage, Defendant issued a social media statement in response to video of the incident being shared online. In its response, Defendant falsely claimed that, like Renee Good, Ms. Martens was an "agitator."[9]

80. The statement also falsely claimed that Ms. Martens attempted to ram the agents with her car.

81. The statement also falsely claimed that Ms. Martens was driving recklessly and nearly collided with other vehicles when, in truth, it was the immigration agents who were driving recklessly.

82. Agents lying about what occurred during Operation Metro Surge was extremely common. As CNN reported, Gregory Bovino was put in charge of agents during Operation Metro Surge –

> Bovino was angry that prosecutors hadn't been filing cases against protesters whom he and his agents claimed had been guilty of AFOs — assaults on federal officers. There was a reason for that. The prosecutors in the US attorney's office, who had previously as a matter of course trusted the accounts of law enforcement officers when they brought AFOs to their office, had seen many of the immigration agents' complaints proved to have been downright false when evidence was presented. The immigration agents, the

---

https://www.mprnews.org/story/2026/01/30/st-peter-police-chief-intervenes-prevents-federal-agents-from-arresting-resident, *see also*: Adeola Adeosun, "Video Shows DHS Agents Detain US Citizen at Gunpoint From SUV in Minnesota," Newsweek (Jan. 31, 2026), https://www.newsweek.com/video-shows-dhs-agents-detain-us-citizen-at-gunpoint-from-suv-in-minnesota-11449254.

[9] Homeland Security (@DHSgov), X, (Jan 31, 2026, at 6:04 PM) https://x.com/DHSgov/status/2017750905290911774 in response to MeidasTouch (@MediasTouch), X, (Jan 31, 2026, at 12:47 PM), https://x.com/MeidasTouch/status/2017671041695592730.

prosecutors concluded, were lying. A lot.[10]

83. On information and belief, the agents knew that none of the actions of Ms. Martens constituted an arrestable offense for obstruction or stalking government operations.

84. No reasonable federal law enforcement officer could believe that Ms. Martens was breaking any law.

85. Rather, they arrested her because they didn't feel like anyone could stop them from doing so.

86. The agents lacked probable cause to believe Ms. Martens violated 18 U.S.C. § 111 because Ms. Martens did not forcibly assault, resist, oppose, impede, intimidate, or interfere with the actions of the ICE agents.

87. It is well-established that "the use of force is an essential element of the offense defined in 18 U.S.C. § 111." *U.S. v. Camp*, 541 F.2d 737, 739 (8th Cir. 1976). This element requires proof of "actual physical contact," or "such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death." *U.S. v. Schrader*, 10 F3d 1345, 1358 (8th Cir. 1993).

88. Upon information and belief, agents during Operation Metro Surge were given specific training prior to January 29, 2026 that blowing whistles, observing and recording ICE agents, or cursing at them, are not considered forcible obstruction under the law and are not grounds to detain protestors or institute an arrest.

---

[10] Jake Trapper, CNN Politics, "18 Days in Minnesota: How immigration agents killed 2 US citizens," (July 22, 2026), https://www.cnn.com/2026/07/22/politics/jake-tapper-minnesota-immigration-shootings

89. Further, upon information and belief, federal agents received training that they have limited arrest authority. For over two decades, ICE agents have been instructed that they can only make arrests for federal non-immigration offenses committed in their presence if there is a likelihood the person will escape before an arrest warrant can be obtained. ICE agents cannot make arrests for violations of state laws or local ordinances, or for offenses not committed in an officer's presence.[11]

90. Upon information and belief, ICE agents may not pursue US citizens. They have limited law enforcement power and policies limit pursuit prohibit the actions taken by the agents who arrested Ms. Martens.

91. Upon information and belief, ICE agents also may not make arrests for obstruction unless the local U.S. Attorney's Office is willing to prosecute such actions.

92. Upon information and belief, a group of agents in the field will have an assigned supervisor or an agent in charge with responsibility to ensure other agents comply with the law and their duties. The supervisor or agent in charge of the agents described in this Complaint was negligent in allowing officers to threaten civilians, arrest United States citizens and permanent residents without legal justification, racially profile minorities in Minnesota, and use excessive force.

---

[11] Michael J. Garcia, U.S. Immigration and Customs Enforcement, *Memo: Superceding* [sic] *Guidance re. Implementation of General Arrest Authority* (November 26, 2003), https://www.ice.gov/doclib/foia/policy/memoGuidanceRegardImpGeneralArrestAuthority_11.26.2003.pdf; *see also* Daniel Ragsdale, U.S. Immigration and Customs Enforcement, *Memo: Delegation of General Arrest Authority Under Title 19*, (April 4, 2016), https://www.ice.gov/doclib/foia/policy/delGeneralArrestAuthority_04.04.2016.pdf

93. The use of force used against Ms. Martens was excessive and violated DHS policy regarding the use of force.[12] Officers correctly trained in use of force, warrantless arrests, general arrest authority, and pursuit would know that they could not have even begun to pursue Ms. Martens for following them, for following her to "give her a warning," or for using any force to pull her out of her vehicle because she had not committed any element of any crime.

94. Further, the excessive use of force by law enforcement agents "will not be tolerated" and those who witness and fail to report such misconduct should be subjected to both administrative and criminal penalties, per the policy memo.

95. Upon information and belief, no agent even wrote up a use of force report for the attack on Ms. Martens.

96. The entirety of the attack and arrest of Ms. Martens was a complete failure of training and supervision.

97. Ms. Martens was engaged in the peaceful and lawful observation of federal agents targeting immigrant communities during Operation Metro Surge. Federal officers had already killed two observers in Minnesota and had shown considerable disdain for legal rights of Minnesotans. Their unlawful pursuit, use of force, and arrest of Ms. Martens was illegal.

98. The agents acted irrationally and conducted themselves unprofessionally, leading to criminal acts on Ms. Martens, including assault and battery and false arrest.

99. The negligent failure to supervise and train its officers also led to the harms faced by Ms. Martens.

---

[12] Alejandro N. Mayorkas, Department of Homeland Security, *Memo: Update to the Department Policy of the Use of Force* (February 6, 2023). https://www.dhs.gov/sites/default/files/2023-02/23_0206_s1_use-of-force-policy-update.pdf

100. Video of the officers pointing guns at Ms. Martens were used during a Senate hearing regarding the conduct of ICE during Operation Metro Surge and questioning of ICE director Todd Lyons.[13]

101. Ms. Martens suffered both physical and mental distress as well from the attack. Her physical injuries have required constant medical attention, including quarterly injections for ablations to her back.

102. Her distress has manifested itself in nightmares, anxiety, and trouble sleeping. She has also gained weight after the incident. She has been diagnosed with PTSD. She has had to miss work because of her medical treatments and mental health. She has had to use PTO to take those breaks.

## CLAIMS FOR RELIEF

### First Claim for Relief

### Federal Tort Claims Act – Assault

103. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

104. Under the FTCA, the United States is liable for the tortious acts of its agents, employees and officers.

105. As reflected by the actions alleged in this Complaint, federal agents acted with the intent to cause Ms. Martens to experience fear or apprehension of imminent harm or offensive contact while they, among other things, drove recklessly at her with their cars and when they pointed their guns at her.

[13] KARE 11: "FULL HEARING: Senate committee grills ICE chief Todd Lyons on MN immigration enforcement tactics." Feb. 12, 2026. Ms. Martens clip is seen at the 1:27:43 moment. Available at https://www.youtube.com/watch?v=Cs2n2ipsEpU.

106. At the time of these actions, the federal agents had the apparent ability to cause the harm and offensive contact to Ms. Martens.

107. Ms. Martens had a reasonable apprehension or fear that imminent harm and offensive contact would occur without significant delay.

108. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

109. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of the United States, directly and proximately caused Ms. Martens to suffer mental and physical injuries.

110. The actions of the federal agents constitute the intentional tort of assault under Minnesota law, for which Defendant is liable for damages.

**Second Claim for Relief**
**Federal Tort Claims Act – Battery**

111. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

112. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

113. As reflected by the actions alleged in this Complaint, the federal agents intentionally caused harmful or offensive contact with Ms. Martens including but not limited to physically pulling her from her car, kneeling on her back, patting her breasts, and handcuffing her without any legal authority.

114. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. Martens to suffer mental and physical injuries.

115. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

116. The actions of the federal agents constitute the intentional tort of battery under Minnesota law, for which Defendant is liable for damages.

**Third Claim for Relief**
**Federal Tort Claims Act – False Arrest/False Imprisonment**

117. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

118. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

119. As reflected by the actions alleged in this Complaint, the federal agents intentionally restricted the physical liberty of Ms. Martens by words and act, including but not limited to boxing in her vehicle, physically detaining and handcuffing her, and transporting Ms. Martens towards the Whipple Federal Building against her will.

120. Ms. Martens was aware of the words and acts of the federal agents and were harmed by them.

121. The federal agents used physical barriers including but not limited to hand cuffs, car doors and physical force, and the threat of the use of immediate physical force to intentionally restrict the physical liberty of Ms. Martens. At all relevant times, Ms. Martens

believed that the federal agents had the ability (though not the lawful authority) to carry out their threats of physical force.

122. The agents who arrested Ms. Martens violated and exceeded any legal authority they had to make arrests for violations of federal laws.

123. The agents, officers, and employees of the United States violated and exceeded any legal authority they had to imprison Ms. Martens for the time period in their vehicle.

124. The restriction on Ms. Martens physical liberty was complete, with no reasonable means of escape known to her once the restriction began.

125. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. Martens to suffer mental and physical injuries.

126. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

127. The actions of the federal agents constitute the tort of false imprisonment and false arrest under Minnesota law, for which Defendant is liable for damages.

**Fourth Claim for Relief**
**Federal Tort Claims Act – Negligence**

128. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

129. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

130. The United States has duty of care for training, supervision, and a general duty of care. The agents, officers, and employees of the Defendant had a legal duty of care to Ms. Martens to, among other things, follow the federal laws faithfully regarding treatment of observers, use of force, warrantless arrests, pursuit, and general arrest authority. The agents also had a duty to supervise and properly train its agents to follow the correct standard relating to the treatment of observers, use of force, warrantless arrests, pursuit, and general arrest authority.

131. An agent in charge or supervisory agent was responsible for the supervision of the group of agents who violated Ms. Martens' legal rights, and failed to satisfy that responsibility by negligently supervising the team of agents.

132. By engaging in the unlawful and unprivileged acts described in this Complaint, including but not limited to committing assault, battery and false arrest against Ms. Martens, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. Martens to suffer mental and physical injuries.

133. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise or performance of discretionary functions or duties.

134. The action of the United States constitutes negligence under Minnesota law, for which Defendant is liable for damages.

**Fifth Claim for Relief**
**Federal Tort Claims Act – Intentional Infliction of Emotional Distress**

135. All of the foregoing paragraphs are hereby incorporated herein by reference and re-alleged as though fully set forth.

136. Under the FTCA, the United States is liable for the tortious acts of its agents, employees, and officers.

137. As reflected by the actions alleged in this Complaint, federal agents engaged in conduct against Ms. Martens which was so extreme and outrageous that it passed the boundaries of decency and is utterly intolerable to the civilized community.

138. The federal agents' conduct was intentional or reckless.

139. The federal agents' conduct caused emotional distress to Ms. Martens.

140. The emotional distress suffered by Ms. Martens was so severe that no reasonable person could be expected to endure it.

141. By engaging in the unlawful and unprivileged acts described in this Complaint, the federal officers, officials, and employees, at the direction of Defendant, directly and proximately caused Ms. Martens to suffer mental and physical injuries.

142. The actions of the federal agents were in violation of the United States Constitution; in violation of binding federal statutes, regulations or official policies; or otherwise, do not constitute the exercise of performance of discretionary functions or duties.

143. The action of the United States constitutes intentional infliction of emotional distress under Minnesota law, for which Defendant is liable for damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request judgment as follows:

A. Finding, adjudging, and declaring the United States has engaged in the violations of law alleged herein;

B. Awarding Plaintiff compensatory damages of $550,000;

C. Awarding Plaintiff their costs and disbursements; and

D. Awarding any and all other additional relief as permitted by law and found by this court to be justified and appropriate.

Dated:

/s/ Ian Bratlie
Ian Bratlie (0319454)
Bratlie Law Office
931 Madison Ave
Suite 206
Mankato, MN 56001
(918) 805-0654
ianbratlie@bratlielawoffice.com